UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JUAN CARLOS BUSTAMENTE,

                  Plaintiff,

      v.

UNO CAFÉ & BILLIARDS INC. d/b/a UNO CAFÉ & BILLIARDS, NY CANTAOKE INC. d/b/a AMOR KARAOKE & BAR, ROSALIA K. LEE, KEN LEE, JOHN PARK, and YANGKEY KIM,

                  Defendants.

15 Civ. 04192 (FB)(RML)

**DEFENDANTS' PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

**Procedural Background**

1.      Plaintiff filed his initial Complaint in this action in the United States District Court for the Eastern District of New York on July 16, 2015.

2.      Plaintiff's Second Amended Complaint included the following claims against Defendants Uno Café & Billiards Inc. ("Uno Café"), NY Cantaoke Inc. ("Amor Bar"), and Yangkey Kim ("Mr Kim"): (i) violation of the overtime provisions of the Fair Labor Standards Act ("FLSA"), (ii) violation of the overtime provisions of the New York Labor Law ("NYLL"), (iii) violation of the notice and recordkeeping requirements of NYLL § 195(1), (iv) violation of the wage statement requirements of NYLL § 195(3), and (v) recovery of equipment costs.[1]

---

[1]     Plaintiff's Proposed Findings of Fact and Conclusions of Law seek recovery of damages for alleged violations of the spread of hours provision of the NYLL's Hospitality Industry Wage Order ("Wage Order"). Plaintiff's claim is denied for two reasons: (i) Plaintiff's Second Amended Complaint does not assert a claim for violation of the Wage Order's spread of hours provision; and (ii) Plaintiff has not established that he is entitled to spread of hours pay because Plaintiff never worked a day where the time end of his shift was more than ten hours after the start of his shift, *see infra* ¶¶ 14-16.

3. Plaintiff's Second Amended Complaint named Rosalie K. Lee, Ken Lee, and John Park as Defendants, but the parties stipulated to the dismissal of Plaintiff's claims against these individuals, without prejudice. [2]

4. A bench trial was held on April 20, 2018, before The Hon. Frederic Block, United States District Judge.

**Plaintiff's Employment Relationship With Defendants**

5. Uno Cafe is a pool hall and eatery located on the second floor of 7901 Roosevelt Avenue in Queens, New York. [3]

6. Amor Bar is a nightclub located on the first floor, directly below Uno Café. [4]

7. Defendant Yangkey Kim is an owner of both Uno Café and Amor Bar. [5]

8. At all relevant times Mr. Kim has been responsible for hiring, paying, managing and supervising employees and other workers at both establishments. [6]

9. At all relevant times, the combined annual revenues of Defendants Uno Café and Amor Bar have exceeded $500,000 per year, and the entities have been an enterprise engaged in interstate commerce within the meaning of the FLSA because they handle goods and materials that have been moved in and produced for interstate commerce. [7]

---

[2] Stipulation of Dismissal Without Prejudice, ECF Doc. #32.

[3] Tr. 55:17-21 [Kim Direct]; Tr. 5:3-5 [Pena Direct].

[4] Tr. 5:6-15 [Pena Direct].

[5] Tr. 49:20-50:8 [Kim Direct].

[6] Stipulated Facts, ECF Doc. #31, at ¶ 6.

[7] Stipulated Facts, ECF Doc. #31, at ¶¶ 7-8.

10. Plaintiff worked at Amor Bar and later at Uno Cafe for a total of approximately eight years, from sometime in calendar year 2006 through June 27, 2015.[8]

11. Mr. Kim grew to trust Plaintiff and the two had a strong, pleasant work relationship.[9]

12. Defendants did not create or provide Plaintiff with documentation concerning his hours of work and compensation during his employment.[10]

**Plaintiffs' Work as a Security Guard at Amor Bar**

13. Plaintiff worked as a security guard and "bouncer" at Amor Bar from the outset of his employment in calendar year 2006 through January 25, 2014.

14. As a security guard, Plaintiff was compensated at the rate of $100 per six-hour shift,[11] with each shift beginning at 10:00 PM and concluding at 4:00 AM the following morning.[12, 13]

---

[8] Tr. 6:3-7 [Pena Direct].

[9] Tr. 17:15-20 [Pena Direct]; Tr. 60:1-6 [Kim Direct].

[10] Tr. 53:8-25 [Kim Direct].

[11] Tr. 32:8-19 [Pena Cross]; Tr. 47:1-10 [Pena Redirect]; Tr. 50:22-51:2 [Kim Direct].

[12] Tr. 50:22-51:2, 53:5-7; 54:7-12 [Kim Direct]; Tr. 83:6-24, 83:6-24, 84:6-22, 85:17-86:3 [Benavides Direct].

[13] Although Plaintiff testified that his shifts as a security guard ran from 10:00 PM through *5:00* AM (Tr. 7:13-16, 8:22-24 [Pena Direct]), the Court does not credit this testimony for several reasons. First, Amor Bar closed at 4:00 AM (51:3-6 [Kim Direct]), and Plaintiff did not proffer any explanation for the nature of his work subsequent to closing hours. Moreover, Armando Benavides, who worked alongside Plaintiff as a security guard for a period of years on weekends – and later staffed Plaintiff's shifts on a full-time basis week round -- testified credibly that as security guards he and Plaintiff worked from 10:00 PM to *4:00* AM, when Amor Bar closed. (*See* Tr. 83:6-24, 83:6-24, 84:6-22, 85:17-86:3 [Benavides Direct]; Tr. 54:25-55:14 [Kim Direct]). Plaintiff made no attempt to rebut this testimony or reconcile the discrepancy between

15. From July 2009 through June 2010, Plaintiff worked six such six-hour shifts per week (i.e., 36 hours per week) and was paid a total of $600 per week.[14]

16. From July 2010 through January 25, 2014, Plaintiff worked seven six-hour shifts per week (i.e., 42 hours per week) and was paid a total of $700 per week.[15]

**Plaintiffs' Work Overseeing Electronic Gaming Terminals at Café Uno**

17. Sometime prior to January 2014, Mr. Kim entered into an arrangement with ANT Vending, an electronic gaming vendor, to furnish Uno Café and Billiards with eight electronic casino-style gaming machines (the "Broadway Game") for the entertainment of its patrons and as an additional source of revenue for the establishment.[16]

18. Mr. Kim wanted a trustworthy representative to be available in the vicinity of the gaming machines to issue cash payments to patrons who "won" the games. [17]

19. Prior to January 26, 2014, the cashiers that worked at Uno Café were responsible for paying customers that "won" on the Broadway Game, but after being arrested in January 2014, one of the cashiers (Hyeong Goo Jang) refused to be responsible for paying customers and Mr. Kim asked Plaintiff to manage the Broadway Game.[18]

---

his claimed work schedule, Benavides's and Kim's testimony, and the fact that Amor Bar closed at 4:00 AM. Indeed, Plaintiff not only declined to provide any rebuttal to the credible testimony of a series of Defense witnesses, but also declined to even sit at counsel's table and look his former co-workers in the eye during the presentation of Defendants' witness.

[14] Tr. 10:19-11:1 [Pena Direct].

[15] Tr. 50:22-51:2, 52:10-19, 53:5-7, 54:7-12 [Kim Direct]; Tr. 11:12-15 [Pena Direct].

[16] See Tr. 56:19-22 [Kim Direct]; Tr. 21:7-19, 23:10-25 [Pena Cross].

[17] Tr. 62:16-19 [Kim Direct].

[18] Tr. 56:25-57:19, 62:16-19 [Kim Direct]; Tr. 106:15-107:6 [Jang Direct].

4

20. By mutual agreement with Mr. Kim, Plaintiff stopped working as a security guard at Amor Bar and instead accepted the new position with responsibility for distributing payments to Broadway Game winners at Café Uno beginning January 26, 2014.[19, 20] Plaintiff's former shifts as a security guard were reassigned to Armando Benavides, effective immediately.[21]

21. Defendants paid Plaintiff at a flat rate of $1,050 per week for his new role overseeing the gaming machines.[22]

22. As game manager, Plaintiff was not required to work a fixed schedule of hours per day or days per week, nor was he required to track or log his hours of work or report to anyone upon his arrival or departure from Uno Café.[23]

23. Apart from the first few weeks in his new position overseeing the gaming machines, Plaintiff almost always arrived to work at Uno Café sometime after 7:00 PM[24] and

---

[19]  Tr. 58:18-22, 62:7-10 [Kim Direct]; Tr. 23:21-25 [Pena Cross]; Tr. 98:2-8 [Porfirio Direct]; Tr. 106:15-107:6 [Jang Direct].

[20]  Although Plaintiff testified that he began overseeing the electronic gaming machines sometime in 2012 (Tr. 9:3-5 [Pena Direct]), the Court does not credit this testimony, which was credibly refuted by several witnesses. Tr. 58:18-22, 62:7-10 [Kim Direct]; 98:2-8 [Porfirio Direct]; 85:17-86:3 [Benavides Direct].

[21]  Tr. 85:17-86:3 [Benavides Direct]; 54:25-55:14 [Kim Direct].

[22]  Tr. 11:16-24 [Pena Direct].

[23]  Tr. 32:8-19 [Pena Cross].

[24]  Tr. 86:19-87:4, 87:22-88:12 [Benavides Direct]; Tr. 106:4-11, 108:1-22 [Jang Direct]; Tr. 115:11-23 [Han Direct].

normally left work between 1:00 AM and 2:00 AM.[25] Plaintiff generally worked these hours six or seven days per week.[26]

24. During the frequent "downtime" while Plaintiff was at Uno Café and there were no patrons requesting payment for winning a Broadway game, Plaintiff was free to drink, play games and chat with friends.[27]

25. Defendants did not prohibit or prevent Plaintiff from sub-contracting to other employees at his discretion to cover the machines during his absences.[28] Plaintiff elected to do so for at least four or five times each week[29] and paid the individuals that he sub-contracted separately for the work that they performed for him.[30]

26. On June 26, 2015, the Police disabled the Broadway gaming machines at Uno Café and announced that their further use was illegal. As a result, Plaintiff's services were no longer required, and Plaintiff stopped working for Defendants.[31]

---

[25] Tr. 64:22-23; 71:23-72:20 [Kim Direct]; Tr. 86:19-87:4, 87:22-88:12 [Benavides Direct]; Tr. 115:24-116:2, 116:9-15 [Han Direct].

[26] *See* Tr. 88:3-9 [Benavides Direct]

[27] Tr. 62:11-19 [Kim Direct]; Tr. 116:3-8, 116:20-117:7 [Han Direct].

[28] Tr. 65:23-66:3 [Kim Direct].

[29] Tr. 87:5-7, 88:3-23 [Benavides Direct]; Tr. 98:20-99:26 [Porfirio Direct].

[30] Tr. 88:6-12 [Benavides Direct]; Tr. 99:3-22 [Porfirio Direct]; Tr. 109:7-11 [Jang Direct].

[31] Tr. 61:11-15 [Kim Direct].

6

27. Plaintiff testified that he was arrested and pled guilty to charges of larceny after walking into a store in September 2017 and stealing several pairs of jeans.[32, 33]

28. Plaintiff testified that he was also arrested in October 2016 and pled guilty to larceny charges after the police found him in a car containing stolen clothing.[34]

## CONCLUSIONS OF LAW

I. **LIABILITY UNDER THE FLSA AND NYLL**

A. **Statute of Limitations: Two Years Under FLSA and Six Years Under NYLL**

Actions under the FLSA must be commenced within two years, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). The statute of limitations under the NYLL is six years with no showing of willfulness required. NYLL §§ 198(3), 663(3).

Here, because Plaintiff commenced this action on July 16, 2015, well within even the two-year statute of limitations under the FLSA — and Plaintiff may recover under the NYLL for events occurring prior to the FLSA limitations period — the determination of willfulness and the question of a two versus three-year limitations period under the FLSA is of little consequence, and Defendants do not dispute the point. The Court will therefore apply the FLSA to the portions of Plaintiff's claims accruing on or after July 16, 2012 (three years prior to the commencement of this action), and will apply the NYLL to the portions of Plaintiff's claims accruing from July 16 2009 through July 15, 2012.

---

[32] Tr. 41:15-17, 41:24-42:24 [Pena Cross].

[33] "While not *crimen falsi* that are automatically admissible under Rule 609(a)(2), theft crimes, and other crimes involving stealth, nonetheless bear on a witness's propensity to testify truthfully." *United States v. Estrada*, 430 F.3d 606, 621 (2d Cir. 2005)

[34] Tr. 44:4-25 [Pena Cross].

7

B.        **Burden of Proof**

Plaintiff must prove by a preponderance of the evidence that Defendants did not adequately compensate him as an employee as required by applicable law. *See Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 391-92 (E.D.N.Y. 2013). Under the NYLL, an employer must maintain accurate records of an employee's hours worked and wages paid. *See* 12 N.Y.C.R.R. § 142-2.6. When an employer has "inaccurate or inadequate" records, a plaintiff may carry his burden by proving that he "has in fact performed work for which he was improperly compensated and if []he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), superseded by statute on other grounds, 29 U.S.C. § 252. Once an employee satisfies his burden, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88. The NYLL mirrors the FLSA with regard to the burden of proof where an employer has failed to keep proper employment records. *See* NYLL § 196-a (where an employer fails "to keep adequate records . . . the employer in violation shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements"); *Doo Nam Yang v. ACB Corp.*, 427 F. Supp. 2d 327, 332 (S.D.N.Y. 2005).

As Defendants here did not make, keep, and preserve records of Plaintiff's wages and conditions of employment, Plaintiff may rely on his recollection alone to meet his initial burden of proving that Defendants violated the statute. *Doo Nam Yang*, 427 F. Supp. 2d at 335 (citing NYLL § 196-a); *Anderson*, 328 U.S. 680 at 687. Under this burden-shifting framework, Defendants can then "present evidence either of the precise wages paid or evidence to 'negative

the reasonableness of the inference to be drawn from the employee's evidence.'" *Doo Nam Yang*, 427 F. Supp. 2d at 332.

The Court has properly applied these standards to the determinations of hours worked and rates of pay during three distinct periods of Plaintiff's employment with Defendants, as set forth in the Findings of Fact above. Specifically:

- From July 2009 through June 2010, Plaintiff worked six, six-hour shifts per week (i.e., 36 hours per week) and was paid a total of $600 per week.[35]

- From July 2010 through January 25, 2014, Plaintiff worked seven, six-hour shifts per week (i.e., 42 hours per week) and was paid a total of $700 per week.

- From January 26, 2014 through June 25, 2015, Plaintiff's weekly hours of work fluctuated along a range of fewer than 49 hours per week (at the "high end") and fewer than 35 hours (at the low-end), with a reasonable estimated average of approximately 42 hours per week.

### C. Plaintiff Was An Independent Contractor and Thus Exempt Under the FLSA and NYLL from January 26, 2014 through June 25, 2015

#### i. *Independent Contractor Status Under the FLSA*

The FLSA regulates the payment of minimum and overtime wages to employees. *Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 453 (S.D.N.Y. 2002). The statutory protections afforded workers under the FLSA, however, are available only to persons classified as "employees." *Id.* The FLSA defines "employee" as any individual employed by an employer. 29 U.S.C. 203(e)(1). Independent contractors do not fall within the FLSA definition of "employee" and are, thus, exempt from the minimum wage and overtime provisions of the statute. *See Brock*

---

[35] Tr. 10:19-11:1 [Pena Direct].

9

v. *Superior Care, Inc.,* 840 F.2d 1054, 1058-59 (2d Cir. 1988) (holding that the FLSA only applies to "employees").

In determining whether a worker is an employee or an independent contractor under the FLSA, the Court must weigh various factors. *See Brock,* 840 F.2d at 1058-59 (applying the "economic reality test" to determine whether an individual is an employee or an independent contractor under the FLSA). The Second Circuit utilizes the "economic reality test" to determine whether a worker should be classified as an employee or an independent contractor under the FLSA. *Brock,* 840 F.2d at 1058-59. These factors, derived from *United States v. Silk,* include: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Id.* (citing *United States v. Silk,* 331 U.S. 704 (1947)). No one factor is dispositive, but rather, "the test is based on 'the totality of the circumstances.'" *Lee,* 186 F. Supp. 2d at 454 (citing *Brock,* 840 F.2d at 1058-59).

Here, the first, second and fifth factors of the economic reality test demonstrate that Plaintiff is properly classified as an independent contractor for the period when he managed the Broadway electronic gaming machines at Uno Cafe (i.e., from January 26, 2014 until the machines were deactivated and his work for Defendants terminated on June 27, 2015).[36]

---

[36] Factors *three* and *four* are each of indeterminate weight as applied to the circumstances of Plaintiff's work overseeing the Broadway gaming machines. These factors therefore do not shift the Court's analysis of the totality of the circumstances favoring either employee or independent contractor status. The third factor carries little weight under the specific circumstances of Plaintiff's work and the nature of Defendants' business. While Plaintiff clearly held a position requiring significant integrity and trust – *viz.* collecting, distributing and documenting quantities of cash money of the Defendants — that qualification amounts more to a trait of character than a

As to *factor one*, Defendants exercised only minimal control (if any) over Plaintiff's work during this period. Plaintiff was free to set his own work schedule or to hire sub-contractors to carry out his work for Defendants in his stead (and Plaintiff routinely did so). *See*, *supra*, ¶¶ 22-23, 25. This factor therefore militates strongly in favor of the conclusion that Plaintiff was an independent contractor during this period.

As to *factor two*, Plaintiff enjoyed the opportunity to realize profits or losses from his work for Defendants, including, for example, by sub-contracting his work to others and retaining a portion of their profit, and by generating substantial tip income (which he retained for himself). Thus, this factor also tilts heavily in favor of independent contractor status.

Finally, *factor five* strongly supports a finding of independent contractor status, as Plaintiff's work overseeing the gaming machines was ancillary to Defendants' business of operating a night club and pool hall. Indeed, Defendants' primary business was unaffected by the decision to remove the gaming machines altogether in June 2015.

In sum, given Plaintiff's freedom to set his own work schedule, to hire sub-contractors to perform his work functions, to drink and play pool and chat with friends while "working", and the fact that Plaintiff's work was unrelated to Defendants' primary business, all converge to support the finding that Plaintiff was an independent contractor during this period of his

---

"skill". Moreover, few if any positions at Defendants require a specialized skill as contemplated by the third economic reality factor, The Court therefore assigns little weight to the third factor for purposes of its analysis here. The fourth factor is likewise of dubious utility here, as Plaintiff's work for Defendants may have continued indefinitely, but could also have been terminated without notice by either party at any time, or by Plaintiff's unilateral decision to appoint someone else to carry out his work functions. The Court therefore assigns little weight to the fourth factor for purposes of its analysis here.

employment. As such, Plaintiff was an independent contractor and cannot state a claim against Defendants under the FLSA for the period from January 26, 2014 to June 27, 2015.

### ii.    *Independent Contractor Status Under the NYLL*

Although the period of Plaintiff's work overseeing the gaming machines falls within the FLSA statutory period (i.e., within the three years prior to the commencement of this action), Plaintiff's status as an independent contractor is even more compelling for purposes of the NYLL Article 6 of the NYLL governs employers' payment of wages to employees. *Bynog* v. *Cipriani Group,* 1 N.Y.3d 193, 198 (2003). "Although the definition of employee is broad, independent contractors are not included." *Bhanti v. Brookhaven Memorial Hospital Medical Center, Inc.,* 260 A.D.2d 334 (2d Dept. 1999). The determination of whether a worker is an employee or an independent contractor under the NYLL depends on an analysis of several factors. "Although slightly different than the FLSA inquiry, the standard for determining a worker's status as an employee or an independent contractor under New York State Labor Law is similar, and accounts for some of the same factors." *Velu,* 666 F. Supp. 3d at 307.

The New York Court of Appeals has held that "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results. *Bynog,* 1 N.Y.3d at 198. "Minimal or incident control over an employee's work product without the employer's direct supervision or input over the means used to complete the work is insufficient to establish a traditional employment relationship." *Bhanti,* 260 A.D.2d at 335 (citing *Matter of Ted is Back Corp.*, 64 N.Y.2d 725, 726 (1984)). Factors relevant to this analysis include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule. *Id.*

Each of these five factors readily underscores Plaintiff's status as an independent contractor within the meaning of the NYLL during the period when he oversaw the gaming machines. Specifically: Plaintiff worked at his own convenience (*factor one*); Plaintiff was free to engage in other employment (*factor two*); Plaintiff received no fringe benefits (*factor three*); Plaintiff was paid a flat weekly cash rate and was never on Defendants' formal payroll (*factor four*); and Plaintiff did not work a fixed schedule (*factor five*). As such, Plaintiff was an independent contractor and cannot state a claim against Defendants under the NYLL for the period from January 26, 2014 to June 27, 2015.

### D. Plaintiff's Overtime Claims

#### i. *Plaintiff did not Work Overtime prior to July 2010*

The evidence presented at trial establishes that, prior to July 2010, Plaintiff worked for Defendants as a security guard at Amor Bar and worked six days per week, six hours per day, for a total of 36 hours per week. *See*, *supra*, ¶¶ 14-15. As a result, Plaintiff is not entitled to any overtime compensation for this time period.

#### ii. *Defendants Failed to Pay Plaintiff Overtime Compensation from July 2010 through January 25, 2014*

The evidence presented at trial establishes that, from July 2010 through January 25, 2014, Plaintiff worked for Defendants as a security guard at Amor Bar and worked seven days per week, six hours per day, for a total of 42 hours per week. *See*, *supra*, ¶ 17. Defendants did not pay Plaintiff overtime compensation at a rate equal to one and one-half times his regular rate of pay for these two hours of overtime per week, as required by the FLSA and NYLL. The damages attributable to this violation of the FLSA and NYLL are outlined below.

13

### iii. Plaintiff's Regular Rate of Pay for Time Period from July 2010 through January 25, 2014

Under the FLSA, if an employee is not paid on an hourly basis, then "[t]he regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." 29 C.F.R. § 778.109.

Conversely, under New York law, "[t]he term regular rate shall mean the amount that the employee is regularly paid for each hour of work. When an employee is paid on any basis other than hourly rate, the regular hourly wage rate shall be determined by dividing the total hours worked during the week into the employees' total earnings." 12 N.Y.C.R.R. § 142-2.16.

Because the NYLL provides the greater measure of damages, the Court will apply the NYLL's definition of "regular rate" when determining Plaintiff's damages.

### iv. Plaintiff's Overtime Damages

As set forth in the findings of fact above, Plaintiff worked seven, six-hour shifts per week (i.e., 42 hours per week) and was paid a total of $700 per week from July 2010 through January 25, 2014. Thus, Plaintiff's "regular rate" of pay was $17.50 per hour (or $700 divided by 40 hours) and Plaintiff's overtime rate of pay was $26.25 (or $17.50 per hour times 1.5). Plaintiff's damages are calculated as follows:

| DATE RANGE | OT RATE | OT HOURS/WEEK | UNPAID OT PAY/WEEK | NUMBER OF WEEKS | UNPAID OT |
|---|---|---|---|---|---|
| 7/1/2010 - 1/25/2014 | $26.25 | 2.00 | $52.50 | 186 | $9,765.00 |

14

      *v.*    **Liquidated Damages**

Both the FLSA and NYLL provide for liquidated damages. The NYLL provides for a liquidated damages award "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law." NYLL §198(1-a)[37]. This is similar to the standard under the FLSA. *See Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 504 (S.D.N.Y. 2015) ("a district court has "discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA."

Defendants have failed to establish that they had a good faith basis for their failure to pay Plaintiff overtime compensation from July 2010 through January 25, 2014 and thus Plaintiff is entitled to an award of liquidated damages, calculated as follows:

| DATE RANGE | UNPAID OT PAY/WEEK | NUMBER OF WEEKS | TOTAL | LIQUIDATED DAMAGES MULTIPLIER | TOTAL |
|---|---|---|---|---|---|
| 7/1/2010 - 4/8/2011 | $52.50 | 40 | $2,100.00 | 25% | $525.00 |
| 4/9/2011 - 1/25/2014 | $52.50 | 146 | $7,665.00 | 100% | $7,665.00 |
| **TOTAL** | | | | | **$8,190.00** |

---

[37] Prior to April 9, 2011, liquidated damages under the NYLL were 25% of the unpaid overtime wages, but after that date, they are 100% of the unpaid overtime wages. *Inclan*, 95 F. Supp. 3d at 505.

15

### E. Wage Statement and Wage Notices Claims Under the NYLL

Defendants did not provide Plaintiff with a wage notice in compliance with NYLL 195(1). Plaintiff is therefore entitled to recover damages in the amount of $50 per week of violation, up to a maximum of $2,500.[38]

Defendants did not provide Plaintiff with wage statements in compliance with NYLL 195(3). Plaintiff is therefore entitled to recover damages in the amount of $100 per week of violation, up to a maximum of $2,500. NYLL 198(1-d).[39]

SO ORDERED:

Dated: New York, New York
_____, 2018

_____
FREDERIC BLOCK
United States District Judge

---

[38]   The NYLL was amended, effective February 27, 2015, to increase the amount of damages for a violation of NYLL § 195(1) to $50 per day, up to a total of $5,000. But because Plaintiff was an independent contractor as of January 25, 2014, the damages for Defendants' failure to comply with NYLL § 195(1)'s pay notice requirement is subject to the pre-2015 limit.

[39]   The NYLL was amended, effective February 27, 2015, to increase the amount of damages for a violation of NYLL § 195(3) to $250 per violation, up to a total of $5,000. But because Plaintiff was an independent contractor as of January 25, 2014, the damages for Defendants' failure to comply with NYLL § 195(3)'s wage statement requirement is subject to the pre-2015 limit.